**STATE OF ILLINOIS, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 397–87C.

United States Claims Court.

Aug. 22, 1988.

As Amended Sept. 22, 1988.

Jeffrey W. Finke, Chicago, Ill., for plaintiff. Neil F. Hartigan, of counsel.

Terrence S. Hartman, Washington, D.C., with whom was Asst. Atty. Gen. John R. Bolton, for defendant. Thomas F. Crane, U.S. Army Corps of Engineers, of counsel.

---

## ORDER

MOODY R. TIDWELL, III, Judge:

This case is presently before the court on defendant's motion for "summary judgment" and plaintiff's ·opposition thereto. Although the issues addressed are principally matters of law, defendant's motion is actually a combination of motions to dismiss for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted. Whereas defendant has not answered plaintiff's complaint, all facts asserted by plaintiff are accepted as true. This is not a case in which matters outside the pleadings are considered to thereby convert the motion to dismiss into one for summary judgment. RUSCC 12(c).

## FACTS

A. *Historical and Procedural Background*

Only relevant facts pertaining to the present dispute are set forth hereinafter. The complete factual history can be found in *Commissioners of Highways v. United States*, 466 F.Supp. 745 (N.D.Ill.1979), *aff'd in relevant part*, 653 F.2d 292 (7th Cir. 1981).

In 1888, Congress authorized the Secretary of War to establish a location for a canal to link the Illinois and Mississippi Rivers. Two years later, Congress authorized funding for construction of the canal, and directed the Secretary of War to acquire title to necessary lands by agreement, purchase, or voluntary conveyance from the owners, or by condemnation through proceedings governed by Illinois law, in federal court. River and Harbor Act of 1890, ch. 907, 26 Stat. 426, 449, *as amended*, River and Harbor Act of 1892, ch. 158, 27 Stat. 88, 106. The River and Harbor Act provided that "the basis of agreement or condemnation shall be the construction and maintenance of bridges [across the canal] by the United States Government." 27 Stat. at 106.

Thereafter, the United States initiated condemnation proceedings in the United States District Court for the Northern District of Illinois, *i.e., United States v. Cass*, No. 8913 (1896); *United States v. Maxson*, No. 9118 (1898); *United States v. Galt*, No. 9139 (1898); *United States v. Howes*, No. 9167 (1899); and *United States v. Rickel*, No. 377 (1900). The condemnation decrees awarded the Commissioners of Highways of various Illinois townships and counties along the canal route consideration of $1.00 per lot, and required the United States to construct and forever maintain bridges across the land for use as public highways. *E.g., United States v. Cass*, No. 8913 (1896).

By 1907, the canal was completed and opened for navigation, replete with about 70 bridges that spanned highways and roads over it. Use of the canal was considerably less than had been anticipated and as early as 1938 the United States considered abandoning the canal as obsolete. After World War II, the Army Corps of Engineers and the State of Illinois began serious negotiations to accomplish a transfer of the canal to the state. Illinois enacted legislation in 1955 wherein, upon acceptance of transfer, the canal would become a state park, and the maintenance of the bridges over the canal would become the responsibility of the state governmental units in which the bridges were located. Illinois and Mississippi Canal—State Park,

Ill.Rev.Stat. ch. 105, para. 482d (1987).[1] Three years later, Congress passed the River and Harbor Act of 1958, which authorized the Army Corps of Engineers to i) use appropriated funds to repair and modify the canal in order to make it suitable for recreational purposes and ii) enter into an agreement with the State of Illinois for transfer of title to the canal. The Act expressly excluded repair of "bridges and roads, which the United States has maintained or has been obligated to maintain." River and Harbor Act of 1958, Pub.L. No. 85–500, § 110(b), 72 Stat. 297, 302.

In 1960, The Corps and the State of Illinois entered into a written transfer agreement. The agreement provided for the transfer of all the United States' rights, title and interest in the canal by quit claim deed, and modification of the canal to recreational purposes as authorized by the 1958 River and Harbor Act. The agreement did not address maintenance of the bridges but stated that upon acceptance of the transfer, the United States was to have "no further obligation with respect to the Canal," except for those items of work set forth in schedule A of the agreement. United States Contract No. DA–11–117–CI-VENG–61–130 at 3.

In 1962, Congress amended the River and Harbor Act to appropriate additional funding, "for the repair and modification of any canal properties and appurtenances, notwithstanding the provisions of section 110(b)...." River and Harbor Act of 1962, Pub.L. No. 87–874, § 106, 76 Stat. 1173, 1179. The amended Act removed the restriction in § 110(b) of the 1958 Act against repair of the canal bridges. *Commissioners*, 466 F.Supp. at 753.[2] Then, in 1963, the 1960 transfer agreement was modified to incorporate by reference the 1962 River and Harbor Act, and to allow for any further work thereafter authorized by monies appropriated through subsequent federal legislation. The work schedules attached to the agreement were also revised at that time, and again in 1964 and in 1971. No work schedule, in the original agreement or in any of its amendments ever made mention of repairs to the bridges but the phrase in the original agreement that "[u]pon conveyance the United States shall have no further obligation with respect to the Canal" was stricken from the agreement. *Id.* Further, a new schedule drafted in 1973 included work on the bridges, consisting of replacement of a majority of the bridges with new bridges or embankments and culverts, and rehabilitation of others. The parties never formally incorporated the draft into the 1960 transfer agreement because the United States Government ceased all further negotiations with Illinois when the *Commissioners* litigation began.

Since 1945, the United States performed only minimal maintenance on the bridges but did perform other substantial rehabilitation work on the canal, pursuant to the 1958 River and Harbor Act and to the satisfaction of Illinois. In August of 1970, the State of Illinois accepted a quit claim deed to the canal. Later that year Congress passed the River and Harbor Act of 1970 further amending the 1958 Act. The new act appropriated, "upon completion of transfer to the State of Illinois of all right, title, and interest of the United States in and to the canal, an additional sum of $6,528,000 to be expended for the repair, modification, and maintenance of bridges ... notwithstanding subsection (b) of this section." River and Harbors, Flood Control Acts of 1970, Pub.L. No. 91–611, § 109(f), 84 Stat. 1818, 1821. Although the amended Act was not expressly incorporated into the transfer agreement, Congress did remove the restriction against work on

---

1. The state governmental units consisted of the townships and counties along the canal route, represented by the respective Commissioners of Highways as successors in office and interest to the parties to the 1896 condemnation proceedings.

2. The court wishes to clarify the *Commissioners* litigation. The district court's decision is reported in the federal supplement, as cited. The district court's Memorandum on damages and its Finding of Facts and Conclusions of Law, both unreported decisions issued on the same day, are cited accordingly. The seventh circuit's decision is cited to the federal reporter.

the bridges with respect to the newly authorized funds.

In 1974, the Commissioners of Highways of several townships and counties along the canal route, as successors in interest to the parties to the 1896 condemnation proceedings, sued the United States in the United States District Court for the Northern District of Illinois. *Commissioners of Highways v. United States,* 466 F.Supp. 745 (N.D.Ill.1979), *aff'd in relevant part,* 653 F.2d 292 (7th Cir.1981). The Commissioners brought suit to enforce the 1896 condemnation decrees which called for the United States to maintain the canal bridges forever.[3] *Commissioners,* 466 F.Supp. at 756, 764. The United States, in turn, filed a third-party suit against the State of Illinois, alleging that its obligation to maintain the bridges had passed to the State of Illinois by virtue of federal and state legislation, and transfer of title to Illinois.

On April 29, 1980, the district court entered final judgment. That court held Illinois responsible for maintenance of the bridges from the date it accepted title to the canal.[4] The court further held, however, that transfer of title did not relieve the United States' past due obligation to maintain the bridges from 1945 to 1970. *Id.* at 766–67. Accordingly, in a subsequent memorandum, the court ordered the United States to pay $2,812,658 plus interest, or the amount needed to put the remaining bridges in the condition they should have been in when the United States transferred the canal. *Commissioners of Highways v. United States,* No. 74C 1861, slip op. at 12 (N.D.Ill. Apr. 29, 1980) (Memorandum decision on damages).

The past due obligation to maintain the bridges to which the court referred was the failure of the United States to perform any work at all on the canal bridges from 1945 to 1970, other than minimal custodial maintenance. By August 1976, only $3,664,000 of the total $8,528,000 Congress appropriated since 1958 for canal rehabilitation work had been expended; yet, none of it had been expended for bridge maintenance work, even though Congress set aside $3,807,000 for that purpose. Not surprisingly, the bridges had fallen into considerable disrepair. By the time the *Commissioners* litigation commenced, the bridges constituted a clear and present danger to public safety. *Commissioners,* 466 F.Supp. at 753–54. Nevertheless, the United States refused to make any repairs after the *Commissioners* lawsuit began.

It should be noted that the United States and Illinois entered into a stipulation in 1975 whereby the State of Illinois undertook emergency repair work on the bridges with its own funds, but without waiver or prejudice of any rights pursued or raised in the ensuing litigation. At that time, most of the bridges were not suitable for long term repairs but needed to be replaced as soon as possible. *Commissioners,* No. 74C 1861, slip op. at 3–4 (N.D.Ill. Apr. 29, 1980) (Findings of Fact and Conclusions of Law). The State of Illinois replaced 39 bridges with culverts and roadways, built two new bridges, and rehabilitated eleven others, for a total cost of $4,750,000.

When the district court entered judgment, it took note of outstanding deficiencies in bridge repair work and ordered defendant to pay $2,812,658 plus interest to the commissioners in order to put the bridges in the condition in which they should have been when the canal was transferred. The court also expressly stated that its decision in no way compromised the State of Illinois' right to look to the United States for reimbursement of sums

---

3. It had become clear to the commissioners that the State of Illinois wanted to delegate to them any maintenance work the state had inherited through the canal transfer.

4. The district court reasoned that the obligation to maintain the bridges was a covenant running with the land, which conveyed to the State of Illinois along with the rest of the agreement, thus making the State responsible for future maintenance on the bridges. The United States Court of Appeals for the Seventh Circuit concurred in the result, but on different grounds. Instead, it found that in light of the Illinois legislation enacted in 1955 and the state's acceptance of title to the canal pursuant to the terms of the conveyance agreement, the United States had no further obligation to maintain the bridges after the transfer in 1970. *Commissioners,* 653 F.2d at 295.

already spent on emergency repair of the canal bridges. *Commissioners,* slip op. at 12–13 (Memorandum on damages). In fact, the court indicated that Illinois would wait to prosecute its claim for reimbursement until "after the termination of this litigation". *Id.* at 13.

On November 4, 1981, the United States deposited $3,722,572 with the clerk of the United States District Court, in full satisfaction of the district court's judgment. As required by the court's decision, this sum came from funds appropriated by the 1958 River and Harbor Act, as amended, and made available for rehabilitation work on the canal.

### B. *The Present Litigation*

Plaintiff, the State of Illinois, filed the instant suit on July 6, 1987, and alleged two counts upon which it seeks recovery from the United States.

In Count I of the amended complaint, plaintiff alleged that the United States failed to reimburse plaintiff for emergency repair work and in doing so the United States (a) deprived plaintiff of property without due process of law, (b) deprived plaintiff of just compensation for property taken, and (c) violated the orders of the United States District Court for the Northern District of Illinois and the United States Court of Appeals for the Seventh Circuit. Plaintiff requested that this court award damages against defendant in the sum of $4,750,000, plus interest and attorney fees.

In Count II, plaintiff alleged that by improperly diverting canal rehabilitation funds already contractually obligated to the State of Illinois to satisfy the district court judgment in *Commissioners,* defendant (a) breached its 1960 contract with plaintiff, (b) deprived plaintiff of just compensation for property taken, and (c) violated the holdings of the District Court for the Northern District of Illinois and the

United States Court of Appeals for the Seventh Circuit. Accordingly, plaintiff asked for additional damages of $3,722,572, plus interest and attorney fees.

Presently the case is before us on defendant's motions under RUSCC 12(b)1 and 12(b)4 requesting the court to dismiss the complaint. Since defendant filed its motion in lieu of an answer to plaintiff's complaint, all of the allegations in the complaint shall be treated as having been admitted by defendant. RUSCC 8(d). Also, to the extent defendant has requested the court to dismiss for lack of jurisdiction and failure to state a claim upon which relief can be granted pursuant to RUSCC 12(b)1 and 12(b)4, it will be treated accordingly.

### DISCUSSION

#### Count I

#### A. *Due Process Claim*

■ The specific jurisdiction of this court under the Tucker Act reaches those claims arising out of the Constitution, Acts of Congress or regulations of federal agencies, or out of an express or implied contract with the United States. 28 U.S.C. § 1491 (1982). These substantive sources of law, however, ground jurisdiction in the United States Claims Court only if they may be fairly construed as mandating payment of money damages against the government. *United States v. Testan,* 424 U.S. 392, 400, 96 S.Ct. 948, 954, 47 L.Ed.2d 114 (1976).

Defendant correctly argued that plaintiff's claims founded on the due process clause should be dismissed because the due process clause of the Constitution does not mandate monetary relief in and of itself. *Inupiat Community v. United States,* 230 Ct.Cl. 647, 662, 680 F.2d 122, 132, *cert. denied,* 459 U.S. 969, 103 S.Ct. 299, 74 L.Ed.2d 281 (1982); *Conservative Caucus, Inc. v. United States,* 228 Ct.Cl. 45, 54, 650 F.2d 1206, 1211–12 (1981); *Royce v. United States,* 1 Cl.Ct. 225, 226 (1982).[5] There-

---

5. In its response to defendant's motions for dismissal, plaintiff declined to further argue its due process claim and acknowledged this court's refusal to extend jurisdiction to such claims. However, plaintiff asked that the claim simply be preserved for the record, inasmuch as plaintiff believes neither the Supreme Court nor the Court of Appeals for the Federal Circuit has ever expressly ruled on the issue.

fore, plaintiff's claim founded on the due process clause is dismissed.

## B. *Taking Claim*

▮ The takings clause of the fifth amendment of the United States Constitution provides: "nor shall property be taken for public use, without just compensation." In order to state a claim under this clause, plaintiff must establish that it was the owner of property and such property was taken by the United States for a public purpose. *Shanghai Power Co. v. United States*, 4 Cl.Ct. 237, 239–40 (1983), *aff'd mem.*, 765 F.2d 159 (Fed.Cir.1985).

In its amended complaint, plaintiff argued that defendant's failure to adequately maintain the canal bridges from 1945 up to the time of the title transfer in 1970 constituted a taking within the purview of the fifth amendment.[6] Plaintiff demanded reimbursement of its expenses on past due maintenance as part of the just compensation guaranteed by the Constitution. Defendant disingenuously responded that because plaintiff elected to spend its own money to repair bridges it owned since the 1970 quitclaim transfer, plaintiff failed to show there was a taking because it did not establish that defendant took plaintiff's funds for defendant's own purposes. Defendant moved to dismiss the taking claim, Count I, for failure to state a claim upon which relief can be granted.

▮ To the extent that defendant contested plaintiff's ability to assert ownership to the lands in question, the court rejects defendant's argument. The plaintiff is the successor in interest to the condemned land by virtue of plaintiff's power to control the lands in question. The state always retains the power to control the disposition and use of its creature's property. *Hunter v. City of Pittsburgh*, 207 U.S. 161, 178–79, 28 S.Ct. 40, 46–47, 52 L.Ed. 151 (1907). It has long been settled that Commissioners of Highways, as legislatively created municipal corporations, are creatures of the state, possessing only those powers which the state may choose to grant them. *E.g., City of Trenton v. New Jersey*, 262 U.S. 182, 186–87, 43 S.Ct. 534, 536–37, 67 L.Ed. 937 (1923). Therefore, even though various Commissioners of Highways of towns along the canal were the original condemnees, plaintiff appears to be empowered as owner to sue the condemnor in the instant case.

▮ Defendant's analysis misses the mark. When defendant condemned the land, the compensation given included a nominal monetary figure and the promise to build and maintain bridges and roads in perpetuity over the canal. That obligation continued until defendant transferred title to the canal and its appurtenances to Illinois in 1970. The transfer of the canal relieved defendant of liability only with respect to future bridge maintenance work; it did not require plaintiff to indemnify defendant for maintenance required during 1945–1970. *Commissioners of Highways v. United States*, 653 F.2d at 297–8. Although in most cases the compensation for a taking of property is monetary, compensation other than money is adequate and may be counted in the determination of just compensation. *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 150–51, 95 S.Ct. 335, 362, 42 L.Ed.2d 320 (1974). The governing law in this matter according to the 1890 and 1896 River and Harbor Acts is Illinois law. Under the Illinois law, stipulations as to future use of property, construction, performance of duties, etc., are binding upon the condemnor. *E.g., East Peoria Sanitary Dist. v. Toledo, P. & W. R.R.*, 353 Ill. 296, 187 N.E. 512 (1933) (a stipulation by condemnor agreeing to do certain things to reduce injury to lands not taken subjects the condemned estate acquired to a binding condition which cannot be evaded or denied). Thus, under Illinois law defendant's condemnation decrees bound defendant to maintain the canal bridges as

---

6. Plaintiff alleged a taking during the years 1945–1970. The court views this as a claim for a temporary taking. When a landowner's rights in his property are made subservient to the United States' use of the same property for a period of time, the United States may have temporarily taken the land. *Economic Devel. & Indus. Corp. v. United States*, 13 Cl.Ct. 590, 602 (1987).

part of the compensation in the 1896–1906 condemnation decrees. *Commissioners*, 466 F.Supp. at 761. Defendant's failure to maintain the bridges for a time may have put the property in the hands of the United States from 1945, when defendant ceased maintenance, to 1970, without full compensation to the condemnees. That is plaintiff's claim. Insofar as bridge maintenance stipulations are recognized under Illinois law, and where such stipulations were part of the basis of land acquisitions for the canal, defendant may have temporarily taken plaintiff's land without just compensation. To this end, the court cannot sustain defendant's motion to dismiss plaintiff's constitutional taking claim.

## C. *Statute of Limitations*

Plaintiff filed the instant suit on July 6, 1987. In its motion defendant argued that even if plaintiff could state a valid claim under the takings clause the claim would be barred by the statute of limitations.

 In the United States Claims Court a claimant may only seek relief if its claim first accrued within six years of the date of filing; otherwise, the claim must be dismissed for lack of jurisdiction. 28 U.S.C. § 2501 (1982); *see Soriano v. United States*, 352 U.S. 270, 273, 77 S.Ct. 269, 272, 1 L.Ed.2d 306 (1957). A claim first accrues on the date when "all the events ha[ve] occurred which would fix the Government's alleged liability and entitle the claimant to demand payment and sue in this court for money damages." *Sellick v. United States*, 222 Ct.Cl. 679, 680, 650 F.2d 285 (1980). It is well established that a claim cannot accrue until the claimant has suffered damages, *e.g., Terteling v. United States*, 167 Ct.Cl. 331, 338, 334 F.2d 250, 254 (1964), because a claim cannot mature, for limitations purposes, before plaintiff has a proper cause of action to plead. If there are any events which have not transpired and which might reasonably be expected to have a direct impact on plaintiff's legal rights, the claim has not accrued. *United States v. Dickinson*, 331 U.S. 745, 749, 67 S.Ct. 1382, 1385, 91 L.Ed. 1789 (1947).

In this case, the determination of when plaintiff's claim accrued is complicated by the fact that plaintiff now owns the land which was once condemned and taken from several of its Commissioners of Highways. In order to determine when plaintiff actually suffered damages and thus had a proper cause of action in this court, it is necessary to refer to *Commissioners of Highways v. United States*, 466 F.Supp. 745 (N.D.Ill. 1979), *aff'd in relevant part*, 653 F.2d 292 (7th Cir.1981). The major issue addressed in *Commissioners* was whether defendant retained any obligation to repair and maintain the bridges both prior and subsequent to the 1970 transfer of title to plaintiff. Had the district court in *Commissioners* found in favor of defendant, plaintiff would not have had a valid claim. As a consequence, plaintiff's claim would be premature and subject to dismissal. *Nager Elec. Co. v. United States*, 177 Ct.Cl. 234, 252, 368 F.2d 847, 859 (1966). But it did not. It is this court's opinion that a final judicial determination of the meaning of the. disputed transfer agreement was a prerequisite to enable plaintiff to determine its rights and whether it had suffered damages because of defendant's nonfeasance. *United States v. Dickinson*, 331 U.S. at 749, 67 S.Ct. at 1385. On April 29, 1980, the district court found in favor of the condemnees and held defendant liable for past due maintenance. That did not close the matter because defendant appealed the decision. On July 7, 1981 the Seventh Circuit affirmed the district court's decision. Inasmuch as the parties did not petition for certiorari, the liability issue for past due maintenance was at that time no longer subject to judicial change. Thus, the statute of limitations ran from the time the Seventh Circuit's judgment became final. *Cf. Terteling v. United States*, 167 Ct.Cl. 331, 338, 334 F.2d 250, 254 (1964).

Defendant, however, alleged that all necessary events to fix its liability occurred on April 29, 1980, when the district court found that plaintiff had spent $4,750,000 on bridge repairs. Yet a claim does not necessarily accrue when a claimant possesses knowledge of his expenses. *Oceanic Steamship Co. v. United States*, 165 Ct.Cl.

217, 225–31 (1964), held that although the claimant did not file a claim until 15 years after he knew the extent of his expenses, the court of claims found its complaint timely because the federal commission delayed in ascertaining the standards for calculating actual damages. Even though *Oceanic Steamship* is factually different from the case at bar, the legal theory is the same. The amount of damage recovery here depends entirely upon the rulings of the district court in Illinois and of the Seventh Circuit. *See Terteling*, 167 Ct.Cl. at 338, 334 F.2d at 254. The district court's factual finding of the amount of money plaintiff spent was extensively discussed in light of the quality of plaintiff's work and whether it even qualified as bridge maintenance work. Thus, as of April 29, 1980, neither the court nor the parties knew whether defendant would remain liable to the Commissioners of Highways for damages until the appeal was concluded.

More importantly, the district court noted that plaintiff clearly and intentionally did not assert its claim against defendant until after termination of the *Commissioners* litigation. The court stated in its judgment that:

> Nothing this Court has said, however, either in its Findings of Fact and Conclusions of Law, its Judgment, or in this Memorandum, is to be taken as in any way compromising the right of the State of Illinois to look to the United States for the sums expended through its Capital Development Board that replaced 39 bridges over the Illinois and Mississippi Canal with culverts.... This subject, as representatives of the United States have stated in the record of these proceedings, will be discussed by agencies of the State and of the United States after termination of this litigation.

*Commissioners*, slip op. at 12–13 (Memorandum decision on damages). An agreement or special statute can establish some other precondition for liability or an unusual time for demanding payment. *Nager Elec. Co. v. United States*, 177 Ct.Cl. 234, 241, 368 F.2d 847, 852 (1966). It is clear that the parties agreed to wait for the outcome of *Commissioners*, because the

judgment would ultimately affect the amount of damages plaintiff might seek an order to determine the extent of defendant's liability for the repair work. If plaintiff had prosecuted its claim before *Commissioners* had finally closed, there would have been unnecessary duplicative litigation and defendant's liability vis-a-vis plaintiff's damages may have been unknown.

In summary, it is the court's opinion that plaintiff's claim accrued at the earliest on July 7, 1981, when all events fixing defendant's liability for past due maintenance had occurred. Accordingly, plaintiff's claim was timely filed and defendant's motion to dismiss as barred by the statute of limitations is denied.

### Count II

### A. Contract Claim

Plaintiff alleged in Count II of its complaint that although the 1960 transfer agreement, as amended, did not by its terms require defendant to expend any funds for the canal, it did require that any congressionally appropriated funds which were spent by defendant had to be for public recreational use and not for maintenance of bridges. Thus, according to plaintiff, when defendant satisfied the *Commissioners* judgment with congressionally appropriated funds defendant violated the transfer agreement in that defendant used funds appropriated exclusively for public recreational use for the repair of bridges. In its motions to dismiss, defendant argued that construction of the 1960 transfer agreement had already been litigated and construed against plaintiff in the *Commissioners* proceeding. Therefore, the doctrine of *res judicata* barred plaintiff's attempt to relitigate the same issue before this court.

 In this circuit, *res judicata* includes both claim and issue preclusion. *E.g., Young Engineers, Inc. v. ITC*, 721 F.2d 1305, 1314 (Fed.Cir.1983). Claim preclusion extinguishes a claim arising out of the same transactional facts which formed the basis for an earlier judgment. *Id.* at 1314. Issue preclusion is the effect of the

determination of an issue of fact or law in another action between the parties on the same claim, or, as here, on a different claim. The court will invoke issue preclusion if four elements are satisfied: (1) the issue previously adjudicated is identical with an issue presented in the current action; (2) the issue was actually litigated in the prior case; (3) the determination of the issue was necessary to the earlier judgment; and (4) the party being precluded was fully represented in the prior action. *Thomas v. GSA*, 794 F.2d 661, 664 (Fed.Cir. 1986); *Jarboe–Lackey Feedlots, Inc. v. United States*, 7 Cl.Ct. 329, 336 (1985).

 Plaintiff's breach of contract claim turns solely upon the issue of whether construction of the 1960 transfer agreement, as amended, required that any appropriated funds be expended only for public recreational purposes. Therefore, this court must determine whether the transfer agreement intended for defendant to be able to repair the canal bridges with funds made available through federal legislation.

This identical issue was expressly resolved by the Seventh Circuit in the parties' cross appeal of the district court judgment in *Commissioners*. Defendant contended that the district court erred in ordering defendant to pay the maintenance costs for bridge repairs not performed between 1945 and 1970 because plaintiff had assumed all of defendant's obligations to maintain the bridges, both future and past, when plaintiff accepted title to the canal. *Commissioners*, 653 F.2d at 295. In support of its argument, defendant relied on clause 4 of the 1960 transfer agreement which provided that upon Illinois' acceptance of title the United States "shall have no further obligation with respect to the Canal," and on the 1958 River and Harbor Act, incorporated by reference into the transfer agreement, which states that "[u]pon such conveyance the United States shall have no further obligation with respect to the canal." 72 Stat. at 302.

This argument was expressly rejected by the Seventh Circuit because the language cited by defendant had been subsequently stricken from the amended agreement. The court stated:

In the 1963 supplemental agreement, clause 4 provides that upon Illinois' acceptance of title to the Canal, the United States will perform 'any further work hereafter authorized ... with funds made available through subsequent Federal legislation.' This later expression of the parties' intent, memorialized in the modified contract, is controlling. In 1970 Congress amended the River and Harbor Act authorizing the United States to expend 'an additional sum of $6,528,000 ... for the repair, modification, and maintenance of bridges.' When the 1963 supplemental agreement and the River and Harbor Act appropriations are read in conjunction, it appears that both the United States and Illinois intended for the United States to retain some responsibility to repair the bridges. We find that the district court's conclusion that the conveyance agreement did not indemnify the United States for past due maintenance [of bridges] is not clearly erroneous.

*Commissioners*, 653 F.2d at 298 (citation omitted). Accordingly, the issue presently in dispute—whether the transfer agreement, as amended, required that appropriated funds only be expended for public recreational purposes—has already been construed against plaintiff by a court of competent jurisdiction in the previous action. Plaintiff cannot deny that construction of the 1960 transfer agreement, as amended, was actually litigated in both the district court litigation and on appeal, and that the Seventh Circuit did in fact resolve the issue. *Id.* at 294, 297–98; *see Mother's Restaurant, Inc. v. Mama's Pizza, Inc.*, 723 F.2d 1566, 1570 (Fed.Cir.1983); *Jarboe–Lackey Feedlots, Inc.*, 7 Cl.Ct. at 336. The resolution of whether the transfer agreement allowed for expenditure of appropriated funds on the canal bridges, was necessary to the finding in *Commissioners* that the agreement did not indemnify defendant for past due bridge maintenance. *Commissioners*, 653 F.2d at 298, and, finally, plaintiff was adequately represented on appeal by the First Assistant Attorney Gener-

al of Chicago, Illinois. *Commissioners*, 653 F.2d at 294.

In summary, as defendant correctly contended, all necessary elements for invocation of the doctrine of issue preclusion have been satisfied. Not surprisingly, plaintiff disagreed. Plaintiff argued that the breach of contract alleged in this case did not occur until November 4, 1981 when defendant remitted $3,722,572 to the clerk of the district court in satisfaction of the *Commissioners* judgment. Since the alleged breach of contract or misuse of appropriated funds did not occur until November of 1981, the Seventh Circuit could not have resolved any issue with respect to the breach during the previous July. This argument fails to acknowledge that if the Seventh Circuit construed the terms and obligations of the contract as defendant says it did, there was no breach at all, in November or at any other time. More importantly, plaintiff confused claim preclusion with issue preclusion. Under the doctrine of issue preclusion, legal issues which are actually and necessarily determined by a court of competent jurisdiction such as the Seventh Circuit here, are normally conclusive in a subsequent suit involving the parties to the prior litigation. *International Order of Job's Daughters v. Lindeburg & Co.*, 727 F.2d 1087, 1090 (Fed. Cir.1984); *Mother's Restaurant*, 723 F.2d at 1569. It is irrelevant for purposes of issue preclusion that plaintiff's breach claim allegedly arose after the decision in *Commissioners*.

Alternatively, plaintiff disputed defendant's version of what the Seventh Circuit actually held. Plaintiff cited language from the district court opinion wherein the court stated that "neither the original agreement nor any of the amendments provided for any work on the highway bridges." *Commissioners*, 466 F.Supp. at 753. This finding, plaintiff asserted, was affirmed by the Seventh Circuit in a footnote wherein the court incorporated by reference the factual history of the controversy stated in the district court's opinion. *Commissioners*, 653 F.2d at 294 n. 1. We feel, however, that a footnote used primarily to abbreviate the lengthy factual back-

ground of this case is a far cry from an affirmance of a contract's particular interpretation, a question of law.

When taken in context with the rest of the findings, it is apparent the district court had not found that the transfer agreement precluded defendant's expenditure of appropriated funds on bridge repairs, but only that the parties had not provided for such repairs in schedule A of the 1960 agreement which set forth specific work items defendant was to complete. In the same paragraph, the court's statement that the agreement did not provide for any work on the bridges preceded its finding that in 1962, congressional legislation later appropriated $800,000 for maintenance of the canal bridges. *Commissioners*, 466 F.Supp. at 753. The parties subsequently incorporated the legislation into the 1963 supplemental agreement, and the district court concluded that the stricture in the transfer agreement against work on the bridges did not apply to these additional funds. *Id.*

Plaintiff argued vehemently that the *Commissioners* litigation construed the 1960 agreement only insofar as it did not indemnify defendant for past-due bridge maintenance. According to plaintiff, the parties never modified the 1960 contract to remove the public recreational use limitation, and that the issue of defendant's continuing, and exclusive, obligation to pay for canal modification had never been litigated. We cannot agree. The Seventh Circuit held that "[w]hen the 1963 supplemental agreement and the River and Harbor Act appropriations are read in conjunction, it appears that both the United States and Illinois intended for the United States to retain some responsibility to repair the bridges." *Commissioners*, 653 F.2d at 298. The court fails to see plaintiff's construction in the plain language of the Seventh Circuit's holding. By its express terms, a court of competent jurisdiction held that the transfer agreement did not provide exclusively for repair and modification of the canal for recreational purposes. The exclusive nature of that agreement is the basis of plaintiff's claim of diversion of

funds in violation of its contract with defendant. Further, all other requirements for the invocation of the doctrine of issue preclusion have been met. We therefore grant defendant's motion to dismiss plaintiff's count II contract claim as barred by the doctrine of *res judicata*.

### B. *Taking Claim*

In Count II of its complaint plaintiff also asserted that plaintiff's expenditure of appropriated funds to satisfy the *Commissioners* judgment deprived plaintiff of just compensation for property taken. It is unclear, however, whether plaintiff intended to allege the taking of the $3,722,572 supposedly diverted from funds meant for recreational modification of the canal, or rather the taking of its rights under the 1960 transfer agreement. In paragraphs 68 and 71 of its complaint, plaintiff asserted:

On November 4, 1981, the United States expended $3,722,572.00 in connection with the Canal. That sum was neither paid to the State of Illinois nor was it paid for work involving recreational use as defined above.

 * * * * * *

[T]he United States improperly diverted the $3,722,572.00....

However, in its brief in opposition to defendant's motion to dismiss, plaintiff cited *Lynch v. United States*, 292 U.S. 571, 579, 54 S.Ct. 840, 843, 78 L.Ed. 1434 (1934), for the proposition that valid contracts are property protected by the fifth amendment, and asserted that defendant's breach of the 1960 transfer agreement gave rise to a taking claim. In either case; whether plaintiff intended the taking of monies or the taking of a contract, plaintiff's claim must fail.

■■■■ In order to make out a claim under the takings clause of the fifth amendment, plaintiff must establish that it was the owner of property, and that such property was taken by the United States for a public purpose. *Shanghai Power Co. v. United States*, 4 Cl.Ct. 237, 239–40 (1983), *aff'd mem.*, 765 F.2d 159 (Fed.Cir. 1985). The Supreme Court has stated that it is impossible to give any categorical definition to the word "property," and that what constitutes property in one context may not be in another. *Segal v. Rochelle*, 382 U.S. 375, 379, 86 S.Ct. 511, 515, 15 L.Ed.2d 428 (1966). However, only those rights which "have the law back of them" are recognized as property within the meaning of the Takings Clause. *Kaiser Aetna v. United States*, 444 U.S. 164, 178, 100 S.Ct. 383, 392, 62 L.Ed.2d 332 (1979) (quoting *United States v. Willow River Power Co.*, 324 U.S. 499, 502, 65 S.Ct. 761, 764, 89 L.Ed. 1101 (1945)). Accordingly, if a plaintiff's interest is devoid of any legally enforceable right, that interest will not be considered property within the context of the fifth amendment.

■■■■ It is undisputed that the monies spent to satisfy the *Commissioners* judgment were taken from funds appropriated by Congress to the Army Corps of Engineers under the River and Harbor Acts. These funds were defendant's property. Plaintiff has cited no authority in its complaint for this court to assume it had a legally enforceable right to the funds appropriated to the Corps by Congress. In fact, plaintiff conceded in its amended complaint, that the 1960 agreement does not "require the United States to expend any funds for the Canal." Accordingly, plaintiff has failed to establish a legally enforceable right to those funds—the first element necessary to a taking.

If plaintiff intended instead to assert the taking of a contract, which might reasonably be assumed by its reference to *Lynch*, plaintiff fares no better. Plaintiff's proposition that a valid contract is property within the meaning of the fifth amendment is certainly sound; it is well-established that defendant may appropriate a contract with the resulting obligation to pay just compensation. *Brooks–Scanlon Corp. v. United States*, 265 U.S. 106, 44 S.Ct. 471, 68 L.Ed. 934 (1924); *accord Kearney & Trecker Corp. v. United States*, 231 Ct.Cl. 571, 576–77, 688 F.2d 780, 783 (1982), *cert. denied* 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed. 2d 929 (1983). "On the other hand, not every exercise of governmental power that

interferes with, or frustrates the performance of a contract, constitutes a compensable taking." *Kearney & Trecker Corp.*, 231 Ct.Cl. at 576, 688 F.2d at 783; *accord Omnia Commercial v. United States*, 261 U.S. 502, 43 S.Ct. 437, 67 L.Ed. 773 (1923). If defendant does not appropriate any of the rights a party has under a contract, then defendant has not taken the contract. *E.g., Omnia*, 261 U.S. at 510–11, 513, 43 S.Ct. at 438, 439. A claimant must first identify what contractual rights have allegedly been appropriated in order to make out a proper taking claim.

In the case at bar, plaintiff cannot identify an enforceable right to the $3,722,572.00 appropriated to the sole discretion of the Army Corps of Engineers that would arise from contractual obligations under the 1960 agreement. As previously discussed, the Seventh Circuit in *Commissioners* found that funds which had been appropriated for bridge maintenance could be used as such without violating the transfer agreement and, plaintiff's construction of that agreement may not be relitigated in this court as the issue is barred by the doctrine of *res judicata.*

*Arguendo*, even if plaintiff had an enforceable contractual right to that part of the $8,528,000 appropriated to the Corp for furtherance of public recreational use, there would still be no taking under the fifth amendment. Of the total $8,528,000 appropriated, Congress specifically set apart $3,807,000 for bridge maintenance, an amount more than sufficient to cover the judgment in *Commissioners*, 466 F.Supp. at 755. Thus, when defendant paid for the judgment out of funds appropriated for canal work it was unlikely that there was any interference with plaintiff's alleged enforceable right to those funds which were appropriated for public recreational use. Contrary to plaintiff's contentions we find no unlawful action in defendant's expenditure of appropriated funds to satisfy the *Commissioners* judgment.

Accordingly, whether plaintiff alleged the property taken was the $3,722,572.00 spent in satisfaction of the *Commissioners* judgment, or plaintiff's contract with defendant, plaintiff has failed to state a proper claim under the takings clause. Thus, plaintiff's Count II taking claim must be dismissed for failure to state a claim upon which relief can be granted.

*Counts I and II*
*Violation of Court Orders and Condemnation Decrees*

In both counts of its amended complaint, plaintiff asserted that defendant's actions constituted a violation of the orders of the United States District Court for the Northern District of Illinois and the United States Court of Appeals for the Seventh Circuit.

In count I plaintiff alleged that defendant had violated the judgment of the district court by failing to reimburse plaintiff the $4,750,000 it spent on bridge repairs. As previously explained, however, the district court expressly stated that nothing the court had said would compromise plaintiff's right to seek reimbursement "after termination of this litigation." *Commissioners*, slip op. at 12–13 (Memorandum decision on damages). Plaintiff even conceded in its response to defendant's motion for summary judgment that its claim was never presented in district court. Defendant, therefore, did not violate the *Commissioners* judgment by not reimbursing plaintiff for its expenditures on the bridges. It appears beyond doubt that plaintiff has failed to state a claim upon which relief can be granted. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

In count II, plaintiff alleged that defendant violated the court's decision in *Commissioners* by using monies appropriated to defendant for purposes other than the furtherance of public recreational use, *i.e.*, to satisfy the judgment. The district court however, expressly ordered that defendant "shall ... from funds in [its] possession appropriated by Congress, for and on behalf of the defendant the United States, pay to the Clerk of this Court the sum of $2,812,658.00, plus 12% thereof from February 23, 1979." *Commissioners*, slip op. at 11 (Memorandum decision on damages).

Consequently, defendant cannot be deemed to have violated the terms of an order with which it expressly complied. *Cf. Maness v. Meyers*, 419 U.S. 449, 458–60, 95 S.Ct. 584, 590–92, 42 L.Ed.2d 574 (1975) (parties must comply with court orders). Therefore, plaintiff has again failed to establish a claim upon which relief can be granted. More importantly, a violation of a court order should be prosecuted in the court which issued the order. In its decision on April 29, 1980, the district court expressly held that "judgment of the Court entered herein shall be the subject of its jurisdiction for enforcement, as by law provided." *Commissioners*, slip op. at 13 (Findings of Fact and Conclusions of Law). Consequently, even if plaintiff had established in this case that a violation of court orders by defendant was a claim upon which relief could be granted, this court would not assert jurisdiction.

Plaintiff, however, responded to defendant's motion by stating that the alleged violations are not of the *Commissioners* proceedings at all, but of the 1896–1906 condemnation decrees issued by the same courts. While plaintiff mischaracterized the allegations contained in its own complaint, the court has examined the new allegations because the parties presented them in their briefs. The court cannot understand plaintiff's assertions in this regard, nor has plaintiff supplied us with substantive support for a plausible claim, other than those already discussed, upon which to base plaintiff's new allegations.

Plaintiff cited only one case to support its new allegations, *Dunnington v. United States*, 24 Ct.Cl. 404 (1889), *rev'd*, 146 U.S. 338, 13 S.Ct. 79, 36 L.Ed. 996 (1892), where the successor-in-interest did not receive just compensation because the court which issued the condemnation decree had made an error in disbursing defendant's payment of the judgment. Even if *Dunnington* were on point, and disregarding the fact that the Supreme Court reversed the case on the merits, it merely supports plaintiffs taking claim, Count I, that in failing to reimburse plaintiff for its expenses for bridge work, defendant took plaintiff's property without just compensation and in violation of the condemnation decrees. Because plaintiff's claims that defendant violated the 1896–1906 condemnation decrees have already been thoroughly discussed, no further discussion is merited.

## CONCLUSION

Plaintiff's due process claim in Count I of its complaint is dismissed for lack of jurisdiction. Defendant's motion to dismiss plaintiff's taking claim, Count I, is denied; the court finds that plaintiff may have a valid taking claim and that the claim was timely filed. Defendant's motion to dismiss plaintiff's contract claim, Count II, as barred by *res judicata*, is granted. Defendant's motion to dismiss plaintiff's taking claim, Count II, is also granted. Plaintiff's claims in Count I and Count II that defendant violated court orders in *Commissioners* are dismissed for failure to state a claim upon which relief can be granted. Plaintiff's claims in Count I and Count II that defendant violated the 1896–1906 condemnation decrees are likewise dismissed for failure to state a claim upon which relief can be granted.

IT IS SO ORDERED.

## ORDER

On September 13, 1988 defendant motioned to file its answer out-of-time. Plaintiff's amended complaint was filed on July 29, 1987; the answer thus being due on October 19, 1987. Instead of filing an answer pursuant to RUSCC 12(a), defendant filed a motion captioned "summary judgment" on October 22, 1987, which consisted of two RUSCC 12(b) motions, to wit: RUSCC 12(b)(1) that the claims asserted by plaintiff were beyond the jurisdiction of this court and RUSCC 12(b)(4) that plaintiff had failed to state a claim upon which relief could be granted. Appended to defendant's motion for summary judgment was one copy each of the unpublished April 12, 1980 "Memorandum" and "Findings of Fact and Conclusions of Law" issued by the United States District Court for the Northern District of Illinois concurrently with its opinion in *Commissioners of High-*

*ways v. United States,* 466 F.Supp. 745 (N.D.Ill.1979), *aff'd in relevant part,* 653 F.2d 292 (7th Cir.1981).

Counsel for defendant styled his October 22, 1987 motion as one for summary judgment because of instructions given him in *J.C. Bass v. United States,* No. 113–86C (Cl.Ct. Oct. 9, 1986) (unpublished order), where, in circumstances similar to this case, defendant was told that his motion to dismiss should have been captioned a motion for summary judgment. Clearly RUSCC 12(b)(1), 12(b)(4) and 12(c) require the court to treat motions to dismiss, if linked with matters outside of the pleadings, as RUSCC 56 motions for summary judgment. This court believed that the attachment of two court-authored documents accompanying defendant's motion, dealing with exactly the same issues and subject matter as in the case at bar, was so borderline that, in its discretion, the court should consider the dispositive motion as motions to dismiss as per RUSCC 12(b)(1) and 12(b)(4), *i.e.,* the appendices were not considered to be matters outside of the scope of the pleadings.

■ Defendant attempted to file its answer within ten days following the partial allowance of its motions but filing was refused by the court on the basis that the answer had been due on October 19, 1987, allegedly because the time for filing its answer was not tolled during the period the court considered its motions to dismiss. This court is of the opinion that the time for filing of defendant's answer was tolled until ten days after it partially denied defendant's RUSCC 12(b) motions and the fact that they were considered by the court as motions to dismiss vice summary judgment made no difference. Moreover, neither party was harmed in any way by the decision of the court to consider the motions to dismiss as such, and neither party addressed the issue substantively in their briefs.

Accordingly, in the interest of justice, because of the confusion surrounding this matter, and, most importantly, in the opinion of the court the time for filing was tolled defendant's motion to file its answer out of time is allowed.

IT IS SO ORDERED.